UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff<br><br>　　v.<br><br>FAYSAL KALAYAF MANAHE,<br>YASER AALI,<br>AMMAR ALKINANI, AND<br>QUASIM SAESAH<br><br>　　　　　Defendants. | **CRIMINAL ACTION**<br><br>**CASE NO. 2:22-CR-13-JAW** |

### DEFENDANT FAYSAL KALAYAF MANAHE'S MOTION TO DISMISS WITH INCORPORATED MEMORANDUM OF LAW

NOW COMES Defendant Faysal Kalayaf Manahe ("Kalayaf") by and through counsel, Norman, Hanson & DeTroy, LLC and moves to dismiss the Indictment in this case pursuant to Rule 12(b)(3)(B)(v) of the Federal Rules of Criminal Procedure on the grounds that the Indictment fails to state a claim for a violation of the Sherman Act, 15 U.S.C. § 1, for the following reasons:

- The application of the *per se* rule as alleged in the Indictment violates the constitutional prohibition—grounded in the Fifth and Sixth Amendments—against instructing juries that certain facts presumptively establish an element of a crime without any factual finding by a jury;

- The Indictment fails to state a *per se* claim for a violation of the Sherman Act, 15 U.S.C. § 1;

- The Indictment alleges an ancillary restraint subject to a rule of reason analysis, which is not properly alleged in the Indictment; and,

1

- Application of the *per se* rule renders the Sherman Act as alleged in the Indictment void for vagueness and violates Kalayaf's Right to Trial by Jury and Due Process rights guaranteed by the Fifth and Sixth Amendment to the United States Constitution.

The grounds for this Motion are set forth more fully in the Incorporated Memorandum of Law.

## INCORPORATED MEMORANDUM OF LAW

## I.   Background

This case arises out of an Indictment dated January 27, 2022 charging Defendants Faysal Kalayaf Manahe ("Kalayaf"), Yaser Aali ("Aali"), Ammar Alkinahi ("Alkinahi"), and Quasim Saesah ("Saesah") (collectively referred to as "Defendants") with a single-count of Conspiracy in Restraint of Trade under the Sherman Act, 15 U.S.C. § 1. (ECF #1)  The Indictment alleges that between April and May 2020—a period of 61 days or less—the Defendants and others "entered into and engaged in a combination and conspiracy to suppress and eliminate competition for the services of PSS [Personal Support Specialist] workers by agreeing to fix the rates paid to PSS workers and by agreeing not to hire each other's workers." *Indictment*, ¶ 15 (ECF #1).

The Indictment does not allege that the Defendants committed any overt act in furtherance of the claimed conspiracy, does not allege that the Defendants' actions unreasonably restrained interstate trade and commerce, and does not

2

allege that any wages were fixed or that any no-poach[1] actions were actually

taken.  (ECF #1).  The Indictment merely alleges a *per se* violation[2] as follows:

> The combination and conspiracy engaged in by the Defendant their co-conspirators was a *per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of the Section I of the Sherman Act (15 U.S.C. § 1)

*Indictment*, ¶ 15 (ECF Doc. #1)

Application of the *per se* rule as alleged in the Indictment would require

this Court to conclusively presume that the Defendants' actions were

unreasonable restraints of interstate trade and commerce without any factual

determination by the jury and based solely on the Indictment regardless whether

Defendants' actions unreasonably restrained interstate trade or commerce.

Kalayaf contends that the Indictment is fatally deficient due to its reliance on the

*per se* standard and fails to state a claim for violation of the Sherman Act, 15

U.S.C. § 1.

---

[1]     The Indictment only alleges that the Defendants agreed not to hire each other's employees.  There is no claim of non-solicitation.  *Indictment*, ¶ 15 (ECF #1).  The Indictment references the unsigned "Association of New Mainers Business Owners and Service Providers Conflict Resolution Agreement"  only mentions "not to solicit clients or employees from other businesses."  *Indictment*, ¶ 17(g) (ECF #1).  Def. Ex. A, ¶ 1(c-d).

[2]     The Department of Justice has a longstanding policy of only bringing criminal antitrust prosecutions based on *per se* violations of the Act.  *See U.S. v. Kemp & Assocs.*, 907 F.3d 1264, 1274 (10th Cir. 2018) (noting that the United States Attorney's Manual states that "current [Antitrust] Division policy is to proceed by criminal investigation and prosecution in cases involving horizontal, *per se*, unlawful agreements.").

## II.    Legal Standard on Motion to Dismiss

Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires that Indictments provide "a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).  An Indictment that fails to state an offense must be dismissed.  Fed. R. Crim. P. 12(b)(3)(B)(v).

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *United States v. Crosby*, 2018 WL 3244071 at *2 (*quoting Hamling v. United States*, 418 U.S. 87, 117 (1974)); *United States v. Sepulveda*, 15 F.3d 1161, 1192 (1st Cir. 1993)).  "[T]he indictment may use the statutory language to describe the offense, but it must also be accompanied by such a statement of facts and circumstances as to inform the accused of the specific offense with which he is charged."  *United States v. Savarese*, 686 F.3d 1, 6 (1st Cir. 2012).  A motion to dismiss an indictment tests "its sufficiency to charge an offense." *United States v. Stevens*, 578 F.Supp.2d 172, 177 (*quoting United States v. Sampson,* 371 U.S. 75, 79 (1962)).

4

### III.    Sherman Act, 15 U.S.C. § 1 and Governing Authority

Section 1 of the Sherman Act, which authorizes both civil and criminal

prosecutions of antitrust violations, provides in relevant part that:

> Every contract, combination in the form of trust or otherwise, or
> conspiracy, in restraint of trade or commerce among the several States, or
> with foreign nations, is declared to be illegal.

15 U.S.C. § 1.

Unlike most traditional criminal statutes, the Sherman Act, "does not, in

clear and categorical terms, precisely identify the conduct which it proscribes."

*United States v. U.S. Gypsum Co.*, 438 U.S. 422, 438 (1978).  Because of the lack

of textual guidance, the Supreme Court "has not taken a literal approach" in

interpreting this language.[3]  *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).

Instead, the Supreme Court has held that Section 1 of the Sherman Act "outlaw[s]

only *unreasonable* restraints."  *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)

(emphasis added).  "As a consequence, most antitrust claims are analyzed under

a 'rule of reason,' according to which the finder of fact must decide whether the

questioned practice imposes an *unreasonable* restraint on competition, taking

into account a variety of factors, including specific information about the relevant

business, its condition before and after the restraint was imposed, and the

---

[3]      The vast majority of reported Sherman Act cases involve civil matters.  There is an
obvious constitutional distinction between civil actions and criminal prosecutors.  This literal
lack of notice violates Kalayaf's due process rights.  *See* Section IV(d).

restraint's history, nature, and effect." *Id.* (*citing Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332, 343, and n. 13, (1982) (emphases added)).

### a. *Rule of Reason Analysis*

As its name suggests, the rule of reason requires a context-specific inquiry to "distinguish[] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). The rule of reason requires a plaintiff or the government to "demonstrate that a particular contract or combination is *in fact unreasonable and anticompetitive*." *Dagher*, 547 U.S. at 5 (emphasis added). As previously noted, the *finder of fact* must decide whether the questioned practice imposes an *unreasonable* restraint on competition. *Khan*, 522 U.S. at 10 (emphases added).

*In Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 726 (1988), the Supreme Court noted that:

> [T]here is a presumption in favor of a rule of reason standard; that departure from that standard must be justified by demonstrable economic effect, such as the facilitation of cartelizing, rather than formalistic distinctions; that interbrand competition is the primary concern of the antitrust laws.

*Id.*

In the present case, the Indictment does not allege a rule of reason violation or any unreasonable restraint of interstate trade or commerce. Instead, the government merely relies upon a *per se* standard requiring this Court to

conclusively presume that the Defendants' actions were anticompetitive and harmful to the consumer based on nothing more than an allegation in the Indictment. In the present case, if this Court determines the rule of reason standard applies, then the Indictment fails to state a claim for violation of the Sherman Act. *See Diaz v. Farley*, 215 F.3d 1175, 1182 (10th Cir. 2000) (dismissing *per se* claim because court determined rule of reason applied). *In re Ins. Brokerage Antitrust Litig*., 618 F.3d 300, 317 (3d Cir. 2010) (*per se* claim will be dismissed if court determines rule of reason applies).

### b. *Per Se Analysis*

As noted in the preceding section, "[d]etermining whether a restraint is undue for purposes of the Sherman Act presumptively calls for . . . rule of reason analysis." *National Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2151 (2021). In contrast to the rule of reason analysis, a smaller group of restraints under Section 1 are "deemed unlawful *per se*" dispensing with the need for case-by-case evaluation. *Kahn***,** 522 U.S. at 10. These restraints are considered unreasonable *per se* if the conduct at issue is "manifestly anticompetitive" and "always or almost always tend[s] to restrict competition and decrease output." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988) (internal citations omitted).

*Per se* treatment is reserved for "only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish

their illegality." *Dagher*, 547 U.S. at 5 (internal citations omitted).  Thus, "the *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue" in order to determine whether it has the requisite "manifestly anticompetitive effect[ ]." *Leegin*, 551 U.S. at 886 (quotation marks omitted).  Again, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition" so as to trigger the *per se* rule.  *Khan*, 522 U.S. at 10.  Kalayaf contends that application of the *per se* rule based solely on conclusory allegations in the Indictment impermissibly relieves the government of proving beyond a reasonable doubt all elements of the offense to a jury.

## IV. Legal Discussion

### a. The application of the *per se* rule as alleged in the Indictment violates the constitutional prohibition—grounded in the Fifth and Sixth Amendments—against instructing juries that certain facts presumptively establish an element of a crime without any factual finding by a jury.

The government seeks to convict Kalayaf of a Sherman Act felony offense without allowing jury consideration of the key criminal elements of reasonableness and anti-competitive effect or whether the *per se* rule is triggered. The Fifth and Sixth Amendments provide a criminal defendant the constitutional right to have a jury decide whether the government has proven every element of a charged offense beyond a reasonable doubt.  The United States Supreme Court has repeatedly held that any jury instruction taking an element away from jurors

8

through an "irrebuttable or conclusive presumption" is unconstitutional. *Francis v. Franklin*, 471 U.S. 307, 317 (1985); *see also, e.g., Carella v. California*, 491 U.S. 263, 265-66 (1989) (per curiam); *Sandstrom v. Montana*, 442 U.S. 510, 517 (1979); *Morissette v. United States*, 342 U.S. 246, 274-75 (1952).  In the present case, the government's tactic denies Kalayaf his right of trial by jury on all elements of the criminal offense and runs afoul of recent United States Supreme Court decisions.

The legal issue presented in this case arises at the juncture of two separate threads of the United States Supreme Court's jurisprudence.  In the first thread of cases, as outlined in Section III(b) of this Motion, the Supreme Court created the *per se* rule in civil antitrust cases, which holds that in certain types of cases, whether an action caused an unreasonable and anti-competitive restraint of trade and commerce is conclusively presumed and need not be proven by a plaintiff.

The second thread of cases arise out of a series of constitutional criminal procedure cases holding that conclusive presumptions are never allowed in criminal cases.  The specific application of the *per se* rule as a conclusive presumption to obtain a felony conviction under the Sherman Act has not been specifically addressed by the Supreme Court.  However, the Supreme Court has not applied a *per se* rule in a criminal case since it decision in *United States v. Frankfort Distilleries*, 324 U.S. 293 (1945).

The *per se* rule was developed through a long line of civil anti-trust cases,

and directly conflicts with the constitutional requirement that the government prove to a jury every element of an offense beyond a reasonable doubt.  In this conflict, the judicially-created, *per se* rule must give way.  The United States Supreme Court has shown the proper resolution of this conflict in a similar issue involving a criminal prosecution under the Sherman Act.

In *United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978), the Supreme Court distinguished civil Sherman Act matters from criminal prosecutions by reading in the added element of criminal intent.  In *U.S. Gypsum,* the Court held "that an effect on prices, without more, will not support a criminal conviction under the Sherman Act."  *Id.* at 435.  The "more" that is required in a criminal prosecution was as follows:

> [A] defendant's state of mind or intent is an element of a criminal antitrust offense which must be established by evidence and inference drawn therefrom and cannot be taken by the trier of fact through reliance on a legal presumption of wrongful intent from proof of an effect on prices.

*Id.*

The Court explained that "the jury must remain free to consider additional evidence before accepting or rejecting [any] inference" regarding intent.  *Id.*  In other words, the issue of intent was a factual question for the jury.

In the present case, Kalayaf's argument is the converse, even if intent is assumed, there must be some unreasonable, anticompetitive effect.  Mere words are not enough.

10

In 1970, prior to its decision in *U.S. Gypsum*, the United States Supreme Court in *In re Winship*, 397 U.S. 358, 364 (1970) set forth the bedrock principle that a jury is required to use the reasonable doubt standard for every element of a criminal offense.  The Court noted the reasonable doubt "standard plays a vital rule in the American scheme of criminal procedure" and "provides concrete substance for the presumption of innocence—that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law'"  *Id.* at 363 (*quoting Coffin v. United States*, 156 U.S. 432, 453 (1895)).

The Supreme Court has reaffirmed and expanded the requirement of proof beyond a reasonable doubt in more recent cases.  The Supreme Court applied the rule in *Winship* to sentencing factors in *Apprendi v. United States*, 530 U.S. 466, 494-95 (2000), to sentencing findings in *Blakely v. Washington*, 542 U.S. 296, 313-14 (2004), and to the federal sentencing guidelines in *United States v. Booker*, 543 U.S. 220, 243-44 (2005).  Finally, in *Alleyne v. United States*, 570 U.S. 99, 117-18 (2013), the Court held that any sentencing factor that increases the mandatory minimum sentence was an "element" of the crime, not a "sentencing factor," that must be submitted to the jury.

In *United States v. Booker*, Justice John Paul Stevens explained the principle succinctly:

It has been settled throughout our history that the Constitution protects

every criminal defendant "against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." It is equally clear that the "Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged." These basic precepts, firmly rooted in the common law, have provided the basis for recent decisions interpreting modern criminal statutes and sentencing procedures.

543 U.S. at 230 (citations omitted) (*quoting In re Winship*, 397 U.S. 358, 364 (1970); *Gaudin*, 515 U.S. at 511)).

Kalayaf recognizes and wishes to bring to this Court's attention, a contrary decision of the United States District Court for the Eastern District of Texas in *United States v. Jindal*, 2021 WL 5578687 (E.D. Tex. Nov. 29, 2021).[4]   In *Jindal*, the district court relied on the Fifth Circuit's decision in *United States v. Cargo Serv. Stations, Inc.*, 657 F.2d 676, 681–84 (5th Cir. 1981) in denying the defendants' motion to dismiss.  *Jindal* at *9.  Respectfully, Kalayaf contends that the decision in *Jindal* was wrongly decided, it was fact-specific, and the Fifth Circuit's decision in *Cargo Serv. Stations* may be distinguished given that the factual background of the present case is more analogous to *United States v. U.S. Gypsum*, 438 U.S. 422 (1978).

In *United States v. Cargo Serv. Stations, Inc.*, the defendants, corporate owners of gas stations, entered into an agreement to fix gas prices, and did, in

---

[4]    In *Jindal*, the Defendants were acquitted of all anti-trust charges following trial, but Jindal was convicted of Obstruction of Proceedings before the Federal Trade Commission. *United States v. Jindal & Rogers*, Eastern District of Texas Docket No. 4:20-cr-358-ALM-KPJ (ECF #112).

fact, follow through with that agreement in setting prices. *United States v. Cargo Serv. Stations, Inc.*, 657 F.2d at 681–84.  In applying the *per se* rule, the Fifth Circuit distinguished *U.S. Gypsum* by noting that *U.S. Gypsum* involved exchange of price information that did not lead to actual price fixing, which resulted in application of the rule of reason. *Cargo Serv. Stations,* 657 F.2d at 681-82.  *See U.S. Gypsum*, 438 U.S. at 438.

In the present case, the Indictment does not allege that the Defendants actually fixed wages or agreed not to solicit or hire others' employees.  As a result, and similar to *U.S. Gypsum*, the rule of reason analysis should be applied in this case, which was not plead in the Indictment.  Kalayaf's argument, however, has an added twist that was not addressed in either of the cases discussed above.

As previously noted, the determination of whether the *per se* rule should apply must be determined by the finder of fact.  *See Khan*, 522 U.S. at 10 ("the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition").  In the present case, the finder of fact is the jury, and that issue must be submitted to a properly-instructed jury.  The government may not avoid this issue merely through a conclusory allegation in the Indictment.

In civil cases, the application of the *per se* rule without a jury finding does

not run afoul of Fifth and Sixth Amendment protections.[5]  However, the same cannot be said for a criminal, felony prosecution.  There is a simple answer that was examined in *dicta* in *United States v. U.S. Gypsum*, 438 U.S. at 442, n. 19. (discussing legislative history and intent supporting distinction between civil and criminal cases).[6]

The *per se* rule may apply to civil actions, but the rule of reason standard must apply to criminal Sherman Act prosecutions in the absence of a jury determination that the *per se* rule is triggered.  This differentiation between civil

---

[5]    *See* Section IV(b) regarding the civil analysis for determining whether the *per se* rule applies outlined in N.C.A.A. v. *Alston*, 141 S.Ct. at 2160.

[6]    In footnote 19 of *U.S. Gypsum*, the Supreme Court noted:

> An accommodation of the civil and criminal provisions of the Act similar to that which we approve here was suggested by Senator Sherman in response to Senator George's argument during floor debate that the Act was primarily a penal statute to be construed narrowly in accord with traditional maxims:
>
> > "The first section, being a remedial statute, would be construed liberally with a view to promote its object. It defines a civil remedy, and the courts will construe it liberally . . . .
> >
> > "In providing a remedy the intention of the combination is immaterial . . .
> >
> > "The third section is a criminal statute, which would be construed strictly and is difficult to be enforced. In the present state of the law it is impossible to describe, in precise language, the nature and limits of the offense in terms specific enough for an indictment." 21 Cong.Rec. 2456 (1890).
>
> Although the bill being debated by Senators George and Sherman differed in form from the Act as ultimately passed, the colloquy between them indicates that Congress was fully aware of the traditional distinctions between the elements of civil and criminal offenses and apparently did not intend to do away with them in the Act.  *United States v. U.S. Gypsum Co.*, 438 U.S. at 442, n.19

and criminal matters would thereby avoid any issues under the Fifth Amendment or Sixth Amendment to the United States Constitution.  Because the Indictment only alleges a *per se* violation, this Court should grant Kalayaf's Motion to Dismiss the Indictment.[7]

### b.  *The Indictment fails to state a per se claim for violation of the Sherman Act, 15 U.S.C. § 1.*

*Assuming arguendo* that the *per se* rule may be applied to the present criminal case, the government seeks to trigger that conclusive presumption by merely alleging that:

> The combination and conspiracy engaged in by the Defendant their co-conspirators was a *per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of the Section I of the Sherman Act (15 U.S.C. § 1)

*Indictment*, ¶ 15 (ECF #1). This bald assertion is inadequate for this Court to find that Defendant's actions are pervasively anti-competitive and a clear violation of the Sherman Act.

In the present case, the Indictment does not allege that any Defendant committed an overt act in furtherance of the alleged "conspiracy or combination" or that the alleged "conspiracy or combination," in fact, had any actual anti-competitive effect.  Although not addressed in the Indictment, none of the alleged

---

[7] From a practical standpoint and given the legal question presented, dismissing the Indictment would promote judicial efficiency by sparing the Court and the parties from trial on indefinite and uncertain legal grounds.  Since the government could immediately appeal the dismissal, if it so chose, the legal issues would be resolved and anyu trial would only address the factual disputes.

parties to the claimed agreement, in fact, ever "fixed" wages or followed any "no-poach" rule.

In civil anti-trust cases, "the decision of what mode of analysis to apply—*per se*, rule of reason, or otherwise—is entirely a question of law for the Court, even though the question might involve factual disputes."  *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1010 (N.D. Cal. 2008).  The operative question is whether "experience with a particular kind of restraint enables the Court to predict with confidence that the antitrust laws condemn it categorically." *State Oil Co. v. Kahn*, 522 U.S. 3, 10 (1997); *see also California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1132 (9th Cir. 2011).

The *per se* rule is only to be used "[w]hen judicial experience with a particular kind of restraint enables a court to predict with certainty that the rule of reason will condemn the restraint." *L.A. Mem'l Coliseum Com'n v. Nat'l Football League*, 726 F.2d 1381, 1387 (9th Cir. 1984).  As the Supreme Court recently explained in *Alston*, 141 S. Ct. 2141, 2156 (2021):

> Recognizing the inherent limits on a court's ability to master an entire industry—and aware that there are often hard-to-see efficiencies attendant to complex business arrangements—we take special care not to deploy these condemnatory tools until we have amassed "considerable experience with the type of restraint at issue" and "can predict with confidence that it would be invalidated in all or almost all instances."  *Id.* (*quoting Leegin Creative* Leather Products, Inc. v. PSKS, Inc*., 551 U.S. 877, 886–887, (2007); Easterbrook, On Identifying Exclusionary Conduct*, 61 NOTRE DAME L. REV. 972, 975 (1986) (noting that it can take "economists years, sometimes decades, to understand why certain business practices work [and] determine whether they work because of increased efficiency or

16

exclusion").

*Id.*

Along the same lines, the Court in *Alston* further noted that:

> Even worse, "[r]ules that seek to embody every economic complexity and
> qualification may well, through the vagaries of administration, prove
> counter-productive, undercutting the very economic ends they seek to
> serve." *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 234 (CA1
> 1983) (Breyer, J.).  After all, even "[u]nder the best of circumstances,"
> applying the antitrust laws "'can be difficult'"—and mistaken
> condemnations of legitimate business arrangements "'are especially costly,
> because they chill the very'" procompetitive conduct "'the antitrust laws are
> designed to protect.'" *Verizon Communications Inc. v. Law Offices of
> Curtis V. Trinko, LLP*, 540 U.S. 398, 414, 124 S.Ct. 872, 157 L.Ed.2d 823
> (2004).  Indeed, static judicial decrees in ever-evolving markets may
> themselves facilitate collusion or frustrate entry and competition.  *Ibid.*  To
> know that the Sherman Act prohibits only *unreasonable* restraints of trade
> is thus to know that attempts to "'[m]ete[r]' small deviations is not an
> appropriate antitrust function."  Hovenkamp, *Antitrust Balancing*, 12
> N.Y.U. J. L. & BUS. 369, 377 (2016).

*Id.* at 1261.

In the present case, the government seeks to trigger the *per se* rule with

nothing more than a bald allegation in the Indictment.  In response, Kalayaf

would make the following offer of proof[8] regarding the lack of any agreement,

conspiracy or combination among the Defendants in this case:

1.      The government has provided an unsigned document entitled

---

[8] Kayalaf recognizes that for purposes of Motion to Dismiss, this Court must accept the
allegations as true.  *United States v. Young*, 694 F.Supp. 2d 25, 27 (D.Me. 2010).  The offer of
proof is made to show the weakness of the government's claim that it can trigger the *per se* rule
by a mere bald allegation rather than proof beyond a reasonable doubt to a jury to trigger a
conclusive presumption.  Kalayaf's argument is simply that whether the *per se* rule is triggered
is a factual issue that is "constrained by a defendant's right to a jury trial."  *Id.*

"Association of New Mainers Business Owners and Service Providers Conflict Resolution Agreement" that contains signature lines for 12 separate entities, but which has no signatures on it (Ex. A).[9]

2.      The government interviewed at least eight individuals in this case, including three who had entered into formal Proffer Agreements[10] with the government, and at least two of those interviewed stated that no agreement was ever reached among the parties. (Ex. B-I).

3.      In the first interview with the government, Individual A stated at a meeting that occurred on April 28, 2020 at one agency's Portland office[11] that "no terms were ultimately agreed upon because not all of the attendees could agree on the terms." (Ex. B-1, p. 4 of 5).

4.      In a second interview with the government, Individual A, again, stated that the meeting on April 28, 2020 ended without the parties "agreeing to terms." (Ex. B-2, p. 4 of 5).

5.      Individual B told the government that draft copies of an agreement (Ex. A) were passed around to the attendees at the in-person meetings at the Portland agency, but "[t]he group was never able to agree on a final draft of the agreement and no signatures were recorded." (Ex. C-1, p. 3 of 5).

6.      Individual B further stated that "if a final draft was agreed upon, then he intended to have an attorney review the document." *Id.*

7.      Individual B also stated that there was a "lack of trust betwee the attendees to the meetings." *Id.*

---

[9] Exhibits A-D were submitted by Defendant Alkinani in support of his Motion to Preclude Alleged Co-Conspirator Statements and for a Preliminary Hearing to Determine the Existence of a Conspiracy that will be filed contemporaneously with this Motion. Those Exhibits are incorporated herein by reference and have been submitted to this Court.

[10] As this Court is aware, Proffer Agreements are informal agreements in which individuals meet with the government to disclose what they know regarding an on-going criminal investigation. It must be presumed that the government was satisfied that the information provided by the three individuals with Proffer Agreements was truthful, as none have be3n withdrawn. *See gen generally*, *U.S. v. Jimenez-Bencivi*, 788 F.3d 7, 15 (1st Cir. 2015) (proffer agreements are informal immunity agreements).

[11] Believed to be identified as "Company F" in Indictment. *Indict.*, ¶17(c).

8.   Individual B was interviewed on two subsequent occasions pursuant
     to a Proffer Agreement with the government.  In that second
     interview, Individual B stated that he had drafted the "Conflict
     Resolution Agreement" (Ex. A), based upon a form that he took off of
     the internet (Ex. C-2, p. 3 of 5).

9.   Individual B stated that the terms of the agreement were discussed
     "but never finalized among the parties." *Id*. at 4 of 5.  He further
     stated that "he never intended to sign that agreement." *Id*.

10.  Individual B further stated that "some of the 12 companies listed on
     the agreement never attended the meetings and that he included
     them simply because attendees at the meetings gave him the names."
     *Id*.

11.  Individual B said that the "first meeting was not productive and did
     not result in an agreement." *Id*. at p. 5 of 5.   He stated that "the
     second and third meetings were more productive . . . However, they
     failed again to reach an agreement that they would sign." *Id*.

12.  In his third interview with the government, Individual B stated that
     "the attendees agreed to run any agreement they reached by an
     attorney prior to signing it." (Ex. C-3, p. 5 of 5).

13.  No one interviewed by the government stated that an agreement was
     ever reached, only that there were "discussions" about fixing rates
     for PSSs in order to stop the poaching of employees. (Ex. D, p. 6 of
     8).

14.  Further evidence supporting the lack of an agreement or conspiracy
     in this matter is found in the financial records of the health care
     agencies owned or co-owned by the four Defendants in this case.

15.  During the alleged time-frame of this "conspiracy" (April 1, 2020 -
     May 31, 2020), none of the Defendants paid the same hourly wages
     to their PSSs, or even paid the amounts that they mentioned during
     their text conversations or meetings that they were going to pay.

16.  As shown below, the hourly wage ranges paid by the agencies of the
     Defendants for that two-month period of time were all different, and

even within a particular agency the hourly wage varied among the PSSs:

| Defendant | Pay Range for PSS in April-May 2020 |
|---|---|
| Faysal Kalyaf Manahe | $15-18 (Ex. E);[12] |
| Yaser Aali | $16-19.50 (Ex. F); |
| Ammar Alkinani | $15-18  (Ex. G ); and |
| Quasim Saesah | $15-19 (Ex. H ). |

17.    The wages actually paid is contrary to the allegation contained in ¶17(d) of the Indictment, which suggests that the Defendants had agreed on or about April 7 and April 9, 2020 to "fix rates" to pay no more than $15-16 per hour to their PSSs.

18.    The wages actually paid are also contrary to ¶17(g), which alleges that the Defendants agreed to pay no more than $17/hour effective June 1, 2020.

19.    The Defendants were already paying some PSSs $18-19.50/hour in April and May 2020.

20.    Barbara Holden ("Holden") is a Provider Relations Specialist with the Maine Department of Health and Human Services where she interprets DHHS policy and advises providers on policy questions regarding MaineCare.  (Ex. I, p. 1)

21.    It is Holden's opinion that it was a problem if one agency went direct with another agency's PSS in order to solicit them to change employers, but she does not know the rules governing the PSS hiring process. (Ex. I, p. 4).

22.    In response to a question from Trial Attorney Nolan Mather, Holden

---

[12] Exhibits E-H contain "confidential financial information, and/or competitively sensitive business information, and have been filed separately under seal by Defendant Alkinani in support of his Motion to Preclude Alleged Co-Conspirator Statements and for a Preliminary Hearing to Determine the Existence of a Conspiracy that will be filed contemporaneously with this Motion.  Those Exhibits are incorporated herein by reference and have been submitted to this Court.  The relevant sections of Exhibit I have been submitted to the Court pursuant to the Protective Order and an agreed version redacted personal identifying information has by filed with this Motion.

> expressed the opinion that one provider sending text messages to
> another provider's PSSs was problematic, but there is no MaineCare
> policy against it.  (Ex. I, p. 4-5).

This factual dispute regarding the rule of reason and application of the p*er se* rule would obviously require a testimonial hearing and factual determination. Because this factual determination concerns a necessary element of the offense, a jury is the proper factfinder.  *See* Section IV(a).  The Court need not reach this issue, however, given that the Indictment as drafted does not even allege sufficient facts to trigger the need for such a testimonial hearing to determine whether application of the *per se* rule is appropriate.

The need for a testimonial hearing and factual determination is set against the backdrop of the Supreme Court's high-standard for application of the *per se* rule even in civil cases.  See *Business Electronics Corp. v. Sharp Electronics Corp*., 485 U.S. at 726 (presumption of rule of reason standard).  The United States Supreme Court's recent decision in *National Collegiate Athletic Ass'n. v. Alston*, 141 S.Ct. 2141 (2021) lends further support for application of the rule of reason standard in the present case.

In *Alston*, the Supreme Court reviewed N.C.A.A. rules limiting eductation-related benefits under a rule of reason analysis.  In its decision, the Court reaffirmed that:

> Most restraints challenged under the Sherman Act—including most joint
> venture restrictions—are subject to the rule of reason, which (again) we
> have described as "a fact-specific assessment of market power and market

structure" aimed at assessing the challenged restraint's "actual effect on competition"—especially its capacity to reduce output and increase price.

*Id*. at 2155 (citing *Ohio v. American Express*, 138 S.Ct., 2274, 2284

(2018) (internal quotation marks omitted).

In the civil context, the Supreme Court also reaffirmed its decision in

*American Express*, and noted the applicable burdens of proof:

> When describing the rule of reason, this Court has sometimes spoken of "a three-step, burden-shifting framework" as a means for " 'distinguish[ing] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.'" As we have described it, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect." Should the plaintiff carry that burden, the burden then "shifts to the defendant to show a procompetitive rationale for the restraint." If the defendant can make that showing, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."

*Alston*, 141 S.Ct. at 2160 (quoting *American Express*, 138 S.Ct. at 2284 (internal

citations omitted)).

If this burden-shifting framework is applied to a civil case, the government

bears the initial burden of proving the anticompetitive effect of the challenged

restraints The burden then potentially shifts to the defendant to show a

procompetitive rationale. In turn, the burden then shifts back to government to

show how procompetitive efficiencies could reasonably be achieved through less

competitive means. *See Alston*, 141 S.Ct. at 2160

Kalayaf's argument on this point is simple.  First, the jury is the proper factfinder.  Second, the Government must prove its case beyond a reasonable doubt, and the burden of proof may never shift to a defendant.  *See* Section IV(a).  Accordingly, the government must prove beyond a reasonable doubt to a jury the following three elements to trigger the *per se* rule:

1. The Defendants' actions had an anticompetitive effect;

2. There is no  procompetitive rationale for the Defendants' actions; and,

3. The procompetitive elements of Defendant's actions could be achieved through less restrictive means.

Following the Supreme Court's decision in *Alston*, a number of courts have blocked application of the *per se* conclusive presumption even in civil matters.  In *Deslandes v. McDonald's USA, LLC*, 2021 WL 3187668, No. 17-cv-4857 at *1 (N.D. Ill. July 28, 2021), the plaintiffs alleged that multiple McDonald's franchises entered into a "no-poach" agreement not to hire each other's employees.  The United States District Court for the Northern District of Illinois concluded that the alleged "no-poach" agreement was subject to the rule of reason analysis, rather than the *per se* rule.  The district court noted that the "Court cannot say that it has enough experience with no-hire provisions of franchise agreements to predict with confidence that they must always be condemned, which means, under *Alston*, that the Court must apply the rule of reason analysis to this case." *Id.* at *7.

23

The decision of the United States District Court for the Southern District of Illinois's in *Conrad v. Jimmy John's Franchise, LLC,* 2021 WL 3268339 at *1 (D. N.Ill.) is also instructive. The plaintiffs in that case alleged that Jimmy John's Franchise Agreement prohibited employees from switching between franchises and therefore was a "naked restraint of competition" and a no-poach agreement that violated the Sherman Act. *Id.*

Applying *Alston* to an alleged no-poach provision, the Court concluded that "monopsony claims were appropriately analyzed under the rule of reason, not the *per se* rule." *Id.* at *10 (*citing Alston*, 141 S.Ct. 2157 (2021). The court in *Conrad* noted that despite an admission from the NCAA in *Alston* that their conduct constituted "horizontal price fixing in a market" in which they "exercise[d] monopoly control," the Supreme Court took "special care not to deploy" a *per se* analysis given the "often hard-to-see efficiencies attendant to complex business arrangements." *Id.* (*quoting Alston*, 141 S.Ct. at 2156).

In the present case, this Court does not have sufficient experience with personal care services among the immigrant community during a pandemic. Accordingly, a per se analysis is not appropriate and the Indictment should be dismissed.

### c. The Indictment alleges an ancillary restraint subject to a rule of reason analysis, which is not properly alleged in the Indictment.

An agreement that would otherwise be condemned as *per se* unlawful is

24

still subject to the rule of reason if it is an ancillary restraint on competition.  *See Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 901 (9th Cir. 1983) ("The proper function of ancillarity in antitrust analysis is to remove in some instances the per se label from restraints otherwise falling within the category." (quotation and citation omitted)). "To be ancillary, and hence exempt from the *per se* rule, an agreement eliminating competition must be subordinate and collateral to a separate, legitimate transaction." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986).  A restraint qualifies as ancillary when it "serves to make the main transaction" between entities in a joint venture "more effective in accomplishing its purpose," *id.*, or is "part of a larger endeavor whose success [it] promote[s]." *Polk Bros., Inc. v. Forest City Enters, Inc.*, 776 F.2d 185, 189 (7th Cir. 1985).

In evaluating whether the alleged agreement between the Defendants was ancillary, the ultimate question is "whether [the] agreement promoted enterprise and productivity at the time it was adopted. If it arguably did, then the court must apply the rule of reason to make a more discriminating assessment." *Polk Bros.*, 776 F.2d at 189.  Put another way, did the restraint in question "viewed at the time it was adopted . . . promote the success of this more extensive cooperation"? *Id.*

As noted in Kalayaf's preceding offer of proof, the discovery produced by the Government establishes that:

- There was conflict between various persons providing PSS services to Portland, Maine's immigrant community.

- These disputes were submitted to MaineCare for resolution, but no action was taken by MaineCare.

- The parties in conflict agreed to meet to attempt a global resolution of all conflicts.

- A proposed agreement for discussion was presented, but never signed or agree to by the alleged, twelve parties.

- It was expected that an attorney would review the "Association of New Mainers Business Owners and Serve Providers Conflict Resolution Agreement" before there was a signed agreement among the parties.

Any alleged "agreement" was rather a discussion among members of Portland's immigrant community about alleged stealing of clients and submission of disputed issue to MaineCare.  However, no consensus was ever reached, no meeting of the minds ever occurred, and the "agreement" listing twelve different providers remained unsigned.  Because the Indictment relies upon the *per se* rule and does not allege a violation of the Sherman Act based upon the rule of reason, this Court should grant Kalayaf's Motion to Dismiss the Indictment as drafted.

### d. *Application of the per se rule renders the Sherman Act as alleged in the Indictment void for vagueness and violates Kalayaf's Right to Trial by Jury and Due Process rights guaranteed by the Fifth and Sixth Amendment to the United States Constitution.*

It is well-established that federal crimes are "solely creatures of statute," *Liparota v. United States*, 471 U.S. 419, 424 (1985), and "the notion of a common-law crime is utterly anathema,"  *Rogers v. Tennessee*, 532 U.S. 451, 476

(2001) (Scalia, J., dissenting).  "Only the people's elected representatives in Congress have the power to write new federal criminal laws." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019).   A penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Skilling v. United States*, 561 U.S. 358, 402 (2010).

The Sherman Act itself does not provide that notice.  It "does not, in clear and categorical terms, precisely identify the conduct which it proscribes." *U.S. Gypsum Co.*, 438 U.S. at 438.  In the present case, the Indictment does not follow the statutory words and simply alleges a violation of the *per se* rule.

As embodied by the "fair warning requirement," due process requires that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Lanier*, 520 U.S. 259, 265 (1997) (internal quotations omitted). The Supreme Court has identified "three related manifestations of the fair warning requirement." *Id.* at 266.

"First, the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Id.* (internal quotations omitted). Second, the rule of lenity "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *Id.* (citations omitted). And third, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the

27

statute nor any prior judicial decision has fairly disclosed to be within its scope." *Id.* (citations omitted). To satisfy each of these requirements, a criminal statute, "standing alone or as construed" must "ma[k]e it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.* at 267.

Again, the present case is factually distinguishable from the district court's decision in *United States v. Jindal*, et al.  The case at bar is, however, factually analogous to *U.S. Gypsum* in that there were discussions among the Defendants and others, but no agreement that led to actual wage fixing or no-poaching conduct.  The Sherman Act cannot be construed to impose strict liability for mere discussion of these issues any more than the *per se* rule can be strictly employed to mere sharing of information under an ancillary agreement in *U.S. Gypsum*.

Prosecution of Kalayaf based upon the shifting sands of the rule of reason, *per se* and quick look analyses of alleged naked or ancillary "no-poach" and "wage-fixing" agreements bear little resemblance to the statutory words of 15 U.S.C. § 1.  In fact, these shifting sands of judicial decisions are less definite than common law and provide less predictability.   For these reasons, section 1 is void for vagueness as alleged in the Indictment, and does not adequately provide notice to Kalayaf or a similarly situated defendant as to what conduct is permitted and what conduct is proscribed.  Accordingly, this Court should grant Kalayaf's Motion to Dismiss.

### e. Conclusion

For the foregoing reasons, this Court should grant Kalayaf's Motion to

dismiss the Indictment (ECF #1) in the present case.

Dated at Portland, Maine this 31st day of May, 2022.

/s/ Thomas S. Marjerison
Thomas S. Marjerison, Esq. ~ Bar No. 7836
Attorney for Faysal Kalayaf Manahe

Norman, Hanson & DeTroy, LLC
Two Canal Plaza
P.O. Box 4600
Portland, ME 04112
Phone: 207-774-7000
Fax: 207-775-0806
tmarjerison@nhdlaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 31, 2022, I caused the filing of the foregoing Motion to Dismiss with Incorporated Memorandum of Law with the Clerk of Court, which sent such notice to the individuals and entities who have entered appearances in this case, pursuant to the Court's ECF system.

/s/ Thomas S. Marjerison
Thomas S. Marjerison, Esq. ~ Bar No. 7836
Attorney for Faysal Kalayaf Manahe

Norman, Hanson & DeTroy, LLC
Two Canal Plaza
P.O. Box 4600
Portland, ME 04112
Phone: 207-774-7000
Fax: 207-775-0806
MarjerisonService@nhdlaw.com
MKane@nhdlaw.com