UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

UNITED STATES OF AMERICA,

v.

FAYSAL KALAYAF MANAHE,
YASER AALI,
AMMAR ALKINANI, AND
QUASIM SAESAH

Defendants.

CRIMINAL ACTION

CASE NO.  2:22-CR-13-JAW

**DEFENDANTS' JOINT, CONSOLIDATED OPPOSITION TO
GOVERNMENT'S MOTIONS IN LIMINE (ECF 155 & 156)**

Defendant Faysal Kalayaf Manahe ("Kalayaf"), by and through counsel, Norman, Hanson & DeTroy, LLC, and together with all Defendants, oppose the United States' Motion in Limine to Exclude Evidence Irrelevant to a Per Se Conspiracy. (ECF 155) and Motion in Limine to Exclude Argument of an Ancillary Restraint Defense. (ECF 156).

The Government's Motions appear to envision a scripted play rather than a criminal trial.  At this juncture, the Defendants only have what the Government contends is the expected evidence and testimony.  It is anticipated that the evidence and testimony at trial will be very different.  Ultimately, a criminal jury trial goes in the direction dictated by the actual evidence and testimony elicited before a jury.  It is difficult, if not impossible, for this Court to determine relevancy in a vacuum.

1

## I.   Evidence and testimony that the Defendants never reached an agreement or followed any agreement to fix wages or engage in "no-poach" activity is relevant and admissible.

Counsel for the Defendants recognize and acknowledge this Court's ruling on their Motion to Dismiss.  However, the Government willfully ignores that the evidence it seeks to exclude is highly relevant to a number of disputed issues at trial on which the Government bears the burden of proof beyond a reasonable doubt.

As noted in Kalayaf's Reply to Government's Opposition to Motion to Dismiss (ECF 102), in the midst of a global pandemic, MaineCare increased the reimbursement rate for Personal Support Specialist (PSS) workers from $20.52 to $26.20 per hour due to increased costs associated with providing care. *Indictment*, ¶ 3 (ECF 1).[1]  In the immigrant community, PSS workers often provide care to relatives and friends.  Accordingly, when PSS workers change jobs, their clients often go with them.   Simply, clients follow the workers, and clients represent revenue to companies.

The practice of employers "acquiring" clients by hiring a specific PSS worker is "frowned upon" by MaineCare, but state agencies do not take any action on this disfavored practice.  According to MaineCare, the proper practice is that upon a

---

[1]      Contrary to the quotation in paragraph 3 of the Indictment, the pay raise was also to help providers address costs associated with the pandemic, such as the costs of personal protective equipment (PPE) and other related expenses. *See* https://www.maine.gov/dhhs/blog/maine-dhhs-announces-mainecare-rate-increases-accelerate-cost-living-adjustments-and-raise-direct-2021-12-30.

PSS worker changing employers, that worker's clients, if they wish to leave the prior employer's care, should go back to MaineCare to be assigned to a new caregiver.

All caregivers are reimbursed at the same rate of $26.20 regardless of their level of experience or degree of care. As alleged in the Indictment, "the difference between the hourly rates that a home health care agency pays to PSS workers and the reimbursement rates it receives from MaineCare constitutes the company's margin."[2]

In the past, MaineCare has been concerned about caregivers making unrealistic promises to potential employees regarding pay or benefits so that they may acquire the employees' clients. However, the reality is that pay rates are limited by reimbursement rates. Although MaineCare sets reimbursement rates, it does not set pay rates, despite the fixed relationship between the two rates.

In the present case, and in the context of this heavily regulated business, an employer began to steal clients by promising wages that would not allow the employer to cover overhead costs based on the reimbursement rates. In other words, the employer promised higher wages so that employees would bring the clients to his company. Once the employer acquired the clients, it could drive

---

[2]    Obviously, the "margin" is not net profit. Employers must take into account a number of costs, including, but not limited to employers' payroll taxes, workers compensation and liability insurance, equipment and supplies, training, supervision and support cost, and unreimbursed charges. The standard accepted mark-up for employees is approximately 25-50%, which is dependent on a number of factors.

competitors out of business.  Out of this predatory attempt to steal clients and reduce competition, a dispute arose in Maine's immigrant community.

In an attempt to resolve this dispute over the stealing of clients--again, a disfavored practice according to MaineCare--various companies who were part of the Association of New Mainers Businesses and Service Providers sat down to discuss resolution of their disputes.  They were unsuccessful, as the unsigned agreement attests.  *See* Def. Ex. A.  In fact, the companies were not even able to generate enough agreement to submit the written document to an attorney for review as they had planned.  From this unsigned agreement, the present prosecution arose.

In the present case, the Government maintains that it is irrelevant whether the Defendants actually committed an overt act, fixed wages, engaged in a "no-poach" agreement or that any actions by the Defendants had an anti-competitive effect.[3]  *Government's Opposition to Motion to Dismiss* at p. 6 (ECF 89); Government's Motion in Limine to Exclude Evidence Irrelevant to a Per Se Conspiracy (ECF 155).  In fact, the Indictment does not allege that anyone actually reduced or limited wages, engaged in "no-poach" actions or took any steps to actually restrain competitive commerce.

Even if the mere allegation in an indictment is sufficient to trigger application of the per se rule, the lack of affirmative acts by the Defendants and

---

[3]     "The Government need not prove either an overt act or anti-competitive effects under the *per se* rule."  *Opposition* at p. 14.

alleged conspirators is highly probative as to whether a contract, combination or

conspiracy actually existed or was actually joined in by any Defendant.  Obviously,

it is impossible to have a contract, combination or conspiracy if there was no

meeting of the minds and there would be no overt acts, wage-fixing or "no poaching

acts if there was not agreement.  In other words, all of this evidence is highly

relevant whether the Government has proven beyond a reasonable doubt:

> *First:*        That a contract, combination or conspiracy actually
> existed to suppress and eliminate competition for the services of PSS
> workers by agreeing to fix the rates paid to PSS workers and by agreeing not
> to hire other's PSS workers as early as April 2020 and continued until as late
> as May 2020.
>
> *Second:*        That each Defendant knowingly--that is voluntarily and
> intentionally--became a member of the charged contract, combination or
> conspiracy to suppress and eliminate competition for the services of PSS
> workers by agreeing to fix the rates paid to PSS workers and by agreeing not
> to hire other's PSS workers. *See Defendants' Preliminary Jury Instruction
> #2* and *Defendants' Requested Jury Instruction #5* (ECF 149)

The best evidence of any Defendant's intent to form or enter into a contract,

combination or conspiracy is his conduct in the alleged formation of any

agreement and actions after the alleged formation of any agreement.  In other

words, did anyone act in conformity with this alleged wage-fixing and no-poach

agreement.

Based upon the Indictment and its filings, the Government appears to

concede that there is no evidence that anyone actually acting in conformity with

the charged contract, combination or conspiracy.  No one actually "fixed" wages,

followed any "no-poach" practice, and or committed any overt act.  In fact, the

Government ignores its own primer on anti-trust law, which notes that an attempt or solicitation (that is, a request) to enter into an agreement to suppress and eliminate competition for the services of PSS workers by agreeing to fix the rates paid to PSS workers and by agreeing not to hire each other's PSS workers that are unsuccessful are not violations of the Sherman Act. *An Antitrust Primer for Federal Law Enforcement Personnel* at p.8, U.S.D.O.J., Antitrust Division (April 2022).

The Government also ignores the fact that a mere hope to form a conspiracy, statements that a party never intended to honor, or mere wishful thinking is not enough. *United States v. Andreas*, 216 F.3d 645, 669 (7th Cir. 2000) (stating that "a defendant who pretended to agree but did not intend to honor the agreement could not be convicted of a crime") (*citing United States v. Bestway Disposal Corp.*, 724 F. Supp. 62, 67 (W.D.N.Y. 1988)); *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977) ("When one of two persons merely pretends to agree, the other party, whatever he may believe, is in fact not conspiring with anyone.") (quotations omitted); *United States v. Bestway Disposal Corp.*, 724 F. Supp. 62, 67-68 (W.D.N.Y. 1988) (statements that alleged conspirator never fully intended to honor or discussions between alleged conspirators that involved no more than "wishful thinking" were not proof that conspirators "agreed" in the manner and for the contemplated evil purpose envisioned by the Sherman Act).

The Government's Motion in Limine is nothing more than a shotgun approach to exclude all evidence that the Government does not like. The test is not prejudice, but rather unfair prejudice outweighed by probative value. Fed.R.Evid. 403. On this

balancing test, this evidence is highly relevant, it is not unfairly prejudicial, and it is admissible.

> **II.   Assuming, *arguendo*, that the Government proves beyond a reasonable doubt that a contract, combination or conspiracy to fix wages or not to hire other's employees existed and was joined by the Defendants, the jury must also consider whether that agreement was ancillary to a separate, legitimate transaction.**

On this issue, the Government appears to seek a mini-trial[4] before trial and asks this Court to pre-rule on potential trial issues. A criminal trial is not a scripted play, and to take this issue away from the jury prior to trial would impermissibly deny the Defendants their right to jury trial guaranteed by the Sixth Amendment to the United States Constitution.

The Government appears to misunderstand the burdens of proof in this case and what a jury may consider as evidence. Although this Court may have ruled that the Defendants bear the burden of proof relating to ancillary restraint, there is no merit to the Government's contention that the Defendants need to make a pre-trial showing or that the jury cannot decide this issue based on the testimony of the witnesses called by the Government.

Both the Government and the Defendants have requested *Pattern Criminal Jury Instruction* § 3.04. which provides, in relevant part, that:

> The evidence from which you are to decide what the facts are consists of sworn testimony of witnesses, both on direct and cross-examination, regardless of who called the witness. . . . Although you may consider only

---

[4]     The Defendants would necessarily have to call the majority of the Government's witnesses in any pre-trial hearing on this issue. Although this would provide some tactical advantage to the Defendants, it seems a waste of time to basically have two trials.

the evidence presented in the case, you are not limited in considering that evidence to the bald statements made by the witnesses or contained in the documents. In other words, you are not limited solely to what you see and hear as the witnesses testify. You are permitted to draw from facts that you find to have been proven such reasonable inferences as you believe are justified in the light of common sense and personal experience.

Chief Judge Torresen's *2022 Revisions to Pattern Criminal Jury Instructions for the District Courts of the First Circuit,* Instruction § 3.04.

With respect to discussions seeking to resolve the discord and disagreements over stealing clients to gain market share, the Defendants agree with the Government regarding the legal standard for evaluating an ancillary-restraints argument:

Restraints normally subject to the per se rule may nevertheless be subject to the rule of reason if the challenged restraint is ancillary to an existing business agreement.  To assert an "ancillary restraint" defense, Defendants must show that their conspiracy was (1) "subordinate and collateral to a separate, legitimate transaction"; and (2) "'reasonably necessary' to achieving that transactions' pro-competitive purpose."

*Government's Motion in Limine to Exclude Argument of an Ancillary Restraint Defense* at p. 2 (ECF 156); *Government's Opposition to Motion to Dismiss* at 15 (ECF 89) (citations omitted).

The Indictment makes scant mention of the attempt to resolve the disputes between the parties through the "Association of New Mainers Business Owners and Service Providers Conflict Resolutions Agreement."  *Compare* Indictment, ¶ 17(g) (ECF 1) *with* Def. Ex. A.[5]  This Association provided a means for members of the immigrant community to advocate for their collective interests and provided a

---

[5]       The Indictment cites from, but does not reference the source as, the "Association of New Mainers Business Owners and Service Providers Conflict Resolutions Agreement."  *Indictment*, ¶ 17(g) (ECF 1).  *See* Def. Exh. A.

forum for members to attempt to resolve disputes.  Unfortunately, the members of the Association were unable to reach an agreement, the written agreement was not signed and, from that failure to reach an agreement, the present prosecution has arisen.

The Defendants are entitled to have the jury determine all of the issues in this case.  Assuming that the Government proves that a contract, combination or conspiracy to fix wages or not to hire other's employees existed and was joined by the Defendants, the jury must also consider whether that agreement was ancillary to a separate, legitimate transaction with a pro-competitive purpose.  To take this issue away from the jury prior to trial and the consideration of any testimony or evidence would impermissibly deny the Defendants their right to jury trial guaranteed by the Sixth Amendment to the United States Constitution.

WHEREFORE, this Court should deny the Government's Motion in Limine to Exclude Evidence Irrelevant to a Per Se Conspiracy. (ECF 155) and the Government's Motion in Limine to Exclude Argument of an Ancillary Restraint Defense. (ECF 156).

Dated at Portland, Maine this 13th day of February, 2023.

/s/ Thomas S. Marjerison
Thomas S. Marjerison, Esq. ~ Bar No. 7836
Attorney for Faysal Kalayaf Manahe

Norman, Hanson & DeTroy, LLC
Two Canal Plaza

9

P.O. Box 4600
Portland, ME 04112
Phone: 207-774-7000
Fax: 207-775-0806
tmarjerison@nhdlaw.com
MKane@nhdlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2023, I caused the filing of the foregoing
Defendants' Opposition to the United States' Motion in Limine to Exclude
Evidence Irrelevant to a Per Se Conspiracy. (ECF 155) and Motion in Limine to
Exclude Argument of an Ancillary Restraint Defense. (ECF 156), which sent such
notice to the individuals and entities who have entered appearances in this case,
pursuant to the Court's ECF system.

/s/ Thomas S. Marjerison
Thomas S. Marjerison, Esq. ~ Bar No. 7836
Attorney for Faysal Kalayaf Manahe

Norman, Hanson & DeTroy, LLC
Two Canal Plaza
P.O. Box 4600
Portland, ME 04112
Phone: 207-774-7000
Fax: 207-775-0806
MarjerisonService@nhdlaw.com
MKane@nhdlaw.com